**Opinion filed May 3, 2023**



In The

# Eleventh Court of Appeals

_____

## No. 11-22-00326-CV

_____

## IN THE INTEREST OF J.W., A CHILD

**On Appeal from the 326th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 10359-CX**

## M E M O R A N D U M   O P I N I O N

This is an appeal from an order in which the trial court terminated the parental rights of the mother and father of J.W.  *See* TEX. FAM. CODE ANN. § 161.001 (West 2022).  The father, Appellant, filed a notice of appeal.  In a single issue, Appellant challenges whether the termination of the parent–child relationship was in the best interest of the child.  We affirm.

*Termination Findings and Standards*

The termination of parental rights must be supported by clear and convincing evidence.  FAM. §§ 161.001(b).  To terminate one's parental rights under

Section 161.001, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(b)(1)(A)–(U) and that termination is in the best interest of the child. *Id.* In this case, the trial court found that the father had committed one of the acts listed in Section 161.001(b)(1)—found in subsection (O). The trial court also found that termination of the father's parental rights would be in the best interest of the child. *See id.* § 161.001(b)(2).

To determine if the evidence is legally sufficient in a parental termination case, we review all of the evidence in the light most favorable to the finding and determine whether a rational trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To determine if the evidence is factually sufficient, we give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We note that the factfinder—in this case the trial court—is the sole arbiter of the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

With respect to the best interest of a child, no unique set of factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or

omissions of the parent that may indicate that the existing parent–child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.J.O.*, 325 S.W.3d at 266.

*Evidence Presented at Trial*

The Department of Family and Protective Services (the Department) became involved with J.W. and her family following a report alleging physical neglect and neglectful supervision of J.W. and her younger brother. At the time of the intake, J.W. and her brother were living with their maternal grandmother. Kelly Reynolds, a child safety specialist for the Department, investigated the allegations. Reynolds conducted a walkthrough of the maternal grandmother's home, describing it as "horrendous," with "things piled up" blocking the door, piles of trash and debris, stagnant water in the bathroom sink, and a toilet "full of disease" in the bathroom. Reynolds noted a man also lived in the home, and the man—along with the grandmother and children—were sleeping on cushions removed from the couch, some of which were also lying on piles of trash and debris. The home had no stove or oven, a molding hotplate, and no food. The children's grandmother was on parole at that time, and Reynolds noted a concern about her sobriety during the walkthrough as well.

The children's mother was contacted and, upon her arrival, explained that she left the children with her mother because she was living in her car. The mother admitted to using drugs with the children's grandmother in that home, later identifying those drugs as methamphetamine and marihuana. The mother and both children were tested for drugs. The children tested positive for methamphetamine, and the mother tested positive for methamphetamine and marihuana. It was determined that the children had different biological fathers, and each was contacted.

J.W.'s brother's biological father arrived quickly following contact by the Department, and the brother was released into his father's custody and dismissed from the case. J.W.'s biological father—Appellant—was contacted and updated about the circumstances of the case. At that point, the Department's goal was to work toward reunification of J.W. and her mother.

The 2INgage case manager, Candice Arevalo, testified that, throughout the life of the case, Appellant was difficult to contact. Arevalo also noted that Appellant and the mother did not participate in the family plans of service that were created for each of them. Appellant refused to sign releases of information required for substance abuse assessment and did not complete his psychological evaluation. Part of Appellant's family plan also included submitting to drug tests. Appellant told Arevalo that he did not want to submit to drug tests because "he would be positive and he did not want [the Department] to have any positive drug tests." Despite this, Arevalo attempted to schedule those tests with Appellant. Appellant only submitted to one hair follicle test. That test indicated that Appellant was positive for methamphetamine, whereas previously he had only disclosed the use of marihuana and ecstasy. Arevalo indicated to the trial court that Appellant was verbally aggressive, using curse words and yelling, during some of his virtual visits with J.W. There were also times that J.W. did not want to speak with Appellant or would end their calls early. Arevalo also testified that Appellant missed about half of his visits and showed up late to many of them as well. J.W. and Appellant only conducted virtual visits, an arrangement that was to be in place until J.W.'s counselor suggested that in-person visits could begin.

When J.W. was removed from her mother's custody, she was placed in a home with a maternal aunt, then with her paternal grandparents, and finally with her brother's biological father (hereinafter referred to as J.W.'s "stepfather"), whom J.W. understood to be her own father, as he was her primary father figure for the

4

seven years preceding this case. J.W. expressed a desire to be with her stepfather and siblings, and Arevalo indicated that J.W. and her stepfather have a loving connection. Since being placed with her stepfather in California, J.W. is "very happy." J.W.'s stepfather wishes to adopt J.W. and make her an official member of his family, facilitating their strong father–daughter relationship and allowing J.W. and her brothers to remain close.

Appellant also testified at the hearing. Appellant told the trial court that he was frustrated with shortened visitation calls with J.W. and that he attempted to reach out to Arevalo in order to report the shorter visits. Appellant indicated that he had also attempted to take additional drug tests but was prevented from doing so by the testing center and by Arevalo. Appellant also maintained that he was not intentionally absent from J.W.'s life but that he was prevented from having contact with her by J.W.'s mother. When asked about child support, Appellant claimed that he "never stopped" paying child support and had been paying it throughout the "entire case and before." Appellant expressed to the trial court that he ultimately just wanted time with his daughter—that he had been deprived of a relationship with her because of the stepfather—and that all he wanted was to be able to have contact with her.

*Analysis*

In Appellant's sole issue,[1] he challenges whether the evidence supports the trial court's finding that termination of his parental rights would be in the best interest of J.W. *See* FAM. § 161.001(b)(2). There is a "strong presumption" in Texas that the best interest of a child is served by keeping the child with the parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, the focus for a best interest

---

[1]Appellant does not challenge the trial court's finding under Section 161.001(b)(1)(O), a finding that was based upon Appellant's failure to comply with the provisions of a court order establishing the actions necessary for him to obtain the return of the child.

determination is on the child, not the parent.  *Interest of D.A.Z.*, 583 S.W.3d 676, 681 (Tex. App.—El Paso 2018, no pet.).  Giving due regard to that presumption of keeping a child with the parent, the evidence presented at trial, and the *Holley* factors, we hold, as explained below, that the evidence is legally and factually sufficient to support the trial court's finding that termination of Appellant's parental rights would be in the best interest of J.W.  *See Holley*, 544 S.W.2d at 371–72.

With respect to J.W.'s best interest, the evidence shows that J.W. has expressed that she wants to be with her stepfather and siblings.  There were times during J.W.'s virtual visits with Appellant that she did not want to talk to him and times that he would become verbally aggressive and angry.  Arevalo testified that Appellant was difficult to contact throughout the case, admitted to drug use, failed to participate in his family plan, tested positive for methamphetamine, and refused to submit to other requests for a drug test.  Appellant additionally was not consistent in attending visits with J.W., missing "about half" of the visits and showing up late.  Viewing the evidence in the light most favorable to the trial court's best interest finding, and considering the record as it relates to the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of Appellant, Appellant's lack of compliance with his family plan, and the plans for the child—to be adopted in the home where her siblings are, we hold that a rational trier of fact could have formed a firm belief or conviction that its finding was true.  *See id.*; *see also J.P.B.*, 180 S.W.3d at 573.  Thus, the evidence is legally sufficient to support the order of termination as it relates to the best interest of the child.

Further, based upon our review of the entire record, *without* viewing the evidence in the light most favorable to the trial court's best interest finding, but still giving due deference to that finding, we hold that the trial court reasonably could have formed a firm belief or conviction that termination of the parent–child

relationship between Appellant and J.W. was in the child's best interest. *See Holley*, 544 S.W.2d at 371–72; *see also C.H.*, 89 S.W.3d at 25–26. Two witnesses testified that J.W.'s stepfather was the primary father figure in her life prior to involvement by the Department and that she had very little contact with Appellant following her first birthday. Arevalo testified that she did not believe it would be psychologically or emotionally harmful to J.W. if Appellant's parental rights were terminated because her stepfather had been the primary father figure in her life for approximately seven years.

Appellant did not deny that he tested positive for methamphetamine, nor did he deny that he refused to complete required paperwork for the family plan. In fact, Appellant's testimony does little to dispute much of the testimony from Arevalo and the stepfather. Instead, Appellant's testimony indicates that he found the involvement of the Department to be frustrating and that the stepfather and the Department were interfering with his visits with J.W., causing them to end early. While this may dispute the possible characterization that Appellant did not want to be involved in J.W.'s life, it does little to combat the evidence that he failed to comply with the service plan, failed to remain free of illegal substances, and failed to attend all of his scheduled visits with J.W. Furthermore, while evidence that Appellant loves J.W. and would like to have a relationship with her is certainly favorable, it cannot ensure a healthy, safe, and stable environment for her, such that a reasonable factfinder could not have resolved the disputed evidence in favor of the finding. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Thus, the evidence is also factually sufficient to support the order of termination as it relates to the best interest of the child.

Based on the *Holley* factors and our review of the record, we cannot hold in this case that the trial court's finding as to best interest is not supported by clear and convincing evidence. Accordingly, we overrule Appellant's sole issue.

*This Court's Ruling*

We affirm the trial court's order of termination.


W. BRUCE WILLIAMS

JUSTICE


May 3, 2023

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.